UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
MARITZA JORDAN,                         )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )        Civil Action No. 15-13320-LTS
                                        )
CAROLYN COLVIN, Acting                  )
Commissioner of the Social              )
Security Administration,                )
                                        )
            Defendant.                  )
_____)

ORDER ON PLAINTIFF'S MOTION TO REVERSE
AND DEFENDANT'S MOTION TO AFFIRM

January 18, 2017

SOROKIN, J.

        For the reasons that follow, the Court DENIES Plaintiff's Motion to Reverse (Doc. 20)

and ALLOWS Defendant's Motion to Affirm (Doc. 25) the denial of Plaintiff's applications for

supplemental security income ("SSI") and disability insurance benefits ("DIB").


I.      PROCEDURAL BACKGROUND

        On June 7, 2013, Plaintiff Maritza Jordan filed applications for DIB and SSI.

Administrative Record ("AR") at 209-225.  At the time, Plaintiff alleged a disability onset date

of May 31, 2013.  Id. at 210, 217.  The Social Security Administration ("SSA") denied Plaintiff's

applications initially and upon reconsideration.  Id. at 163, 166, 171-76.

        At Plaintiff's request, on September 10, 2014, a hearing was held before an

Administrative Law Judge ("ALJ").  Id. at 177-78, 191.  At the hearing, Plaintiff was represented

by a "student attorney," who was accompanied by a supervising attorney. Id. at 63. On the date

of the hearing, Plaintiff amended her alleged onset date of disability ("AOD") from May 31,

2013, to January 1, 2014. Id. at 242.

On November 20, 2014, the ALJ issued a decision finding Plaintiff had not been under a

disability, as defined by the Social Security Act, from January 1, 2014, through the date of the

decision. Id. at 51.

On January 20, 2015, Plaintiff submitted a request for review of the ALJ's decision, as

well as various additional evidence, to the SSA's Appeals Council. Id. at 12. On July 10, 2015,

the Appeals Council denied Plaintiff's request for review, finding no "basis for changing the

Administrative Law Judge's decision." Id. at 1-2. With respect to the additional evidence

Plaintiff submitted, the Appeals Council found it did "not show a reasonable probability that,

either alone or when considered with the other evidence of record, would change the outcome of

the decision." Id. at 2 (citation omitted).

On September 8, 2015, Plaintiff filed the instant action. Doc. 1. On May 9, 2016,

Plaintiff filed the instant Motion to Reverse. Doc. 20. On July 20, 2016, Defendant filed the

instant Motion to Affirm. Doc. 25. On August 16, 2016, Plaintiff filed a Reply. Doc. 29. On

September 13, 2016, Defendant filed a Sur-Reply. Doc. 33.


II.      LEGAL STANDARDS

    A.      Entitlement to Benefits

A claimant's entitlement to DIB or SSI turns on whether she has a "disability," defined

by the Social Security Act as an "inability to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); see 20 C.F.R. § 404.1505.[1]  Such impairment must be sufficiently severe, rendering the claimant unable to engage in any of her previous work or any other gainful activity that exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505.

The Commissioner follows a five-step sequential analysis to determine whether an individual is disabled and thus whether the application for Social Security benefits should be approved.  20 C.F.R. § 404.1520(a); see also Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). At step one, if the claimant is engaged in substantial gainful work activity, she is not disabled and the application is denied.  20 C.F.R. § 404.1520(a).  At step two, if the claimant does not have, or has not had, within the relevant time period, a severe medically determinable impairment or combination of impairments, she is not disabled and the application is denied.  Id. At step three, if the impairment meets the conditions of one of the "listed" impairments in the Social Security regulations, the claimant is disabled and the application is approved.  Id.  At step four, where the impairment does not meet the conditions of one of the listed impairments, the Commissioner determines the claimant's residual functional capacity ("RFC").  Id.  If the claimant's RFC is such that she can still perform past relevant work, she is not disabled and the application is denied.  Id.  At step five, if the claimant, given her RFC, education, work experience and age is unable to do any other work within the national economy, she is disabled and the application is approved.  Id.

---

[1] Although this Order references only 20 C.F.R. Part 404, which applies to DIB, 20 C.F.R. Part 416 contains nearly identical regulations that apply to SSI.

The claimant bears the burden of proof for the first four steps, and must furnish medical or other evidence of the existence of a disability.  Britt v. Colvin, 125 F. Supp. 3d 349, 353 (D. Mass. 2015).  "At the fifth step of the analysis, the burden shifts to the Commissioner to show that the claimant is capable of performing jobs available in the national economy."  Id. (citing Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001)).  The ALJ must consider all of the evidence in the case record, 20 C.F.R. § 404.1520(a)(3), and resolve any conflicts in the evidence.  Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  However, the ALJ need not "directly address[] in [her] written decision every piece of evidence" or make "explicit credibility findings as to each bit of conflicting testimony, so long as [her] factual findings as a whole show that [she] implicitly resolved such conflicts."  N.L.R.B. v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 26 (1st Cir.1999) (citations, alterations, and internal quotation marks omitted); accord Blackette v. Colvin, 52 F. Supp. 3d 101, 119 (D. Mass. 2014).

B.      Standard of Review

This Court may affirm, modify or reverse the Commissioner's decision upon review of the record.  See 42 U.S.C. § 405(g).  However, judicial review is limited "to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  Even where the record "arguably could justify a different conclusion," the Court must accept the Commissioner's findings of fact as conclusive if they are "supported by substantial evidence."  See Whitzell v. Astrue, 792 F. Supp. 2d 143, 148 (D. Mass. 2011) (quoting Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)) (internal quotation marks omitted); 42 U.S.C. § 405(g).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record

as a whole, could accept it as adequate to support [the Commissioner's] conclusion." <u>Irlanda Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991) (quoting <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981)) (internal quotation marks omitted).

III.   <u>DISCUSSION</u>

Plaintiff makes three arguments for reversal:  (1) at step two, the ALJ and Appeals Council improperly failed to include her rotator cuff impingement as a severe impairment; (2) the ALJ "made several errors in the weight that he attributed to the opinions offered into evidence"; and (3) the ALJ failed to include Plaintiff's exertional limitations in the questions he posed to the vocational expert.  Doc. 21 at 13-15.  The Court will address each argument in turn.

A.   <u>Whether the ALJ and Appeals Council Failed at Step Two</u>

1.   <u>Background</u>

Plaintiff argues that the ALJ and the Appeals Council "erred in not including the Plaintiff's impingement of her rotator cuff as a severe exertional impairment."  Doc. 21 at 13. Plaintiff notes that in a June 18, 2013, report, she stated she can lift "no more than 5 pounds." <u>Id.</u> (citing AR at 277).  Plaintiff further notes that on January 20, 2015, she submitted to the Appeals Council a "patient summary sheet from 2011 documenting a torn rotator cuff and a letter [dated June 23, 2011] from the Plaintiff's physician instructing that the Plaintiff should not lift more than five pounds."  <u>Id.</u> at 2-3; <u>see also</u> AR at 58.  Plaintiff acknowledges she did "not raise[] this physical impairment before" January 20, 2015.  Doc. 21 at 3.  Plaintiff asked the Appeals Council to include the rotator cuff impairment in the record and argued it made "a

difference in the outcome of the Plaintiff's claim."  Id.  However, the Appeals Council determined there was no reasonable probability that the evidence Plaintiff submitted on January 20, 2015, would have changed the ALJ's decision.  AR at 2.

2.  Analysis

The Court rejects Plaintiff's argument that the ALJ erred at step two by not including the impingement of her rotator cuff as a severe exertional impairment.  This Court "may review the ALJ decision solely on the evidence presented to the ALJ," not on any new evidence presented to the Appeals Council.  Mills v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001).  Plaintiff, by her own admission, did "not raise[]" rotator cuff impingement as a basis of her alleged disability until January 20, 2015, two months after the ALJ issued his decision.  Id. at 3.  Indeed, when asked in a report dated June 7, 2013, to list what physical or mental conditions limited her ability to work, Plaintiff exclusively listed mental conditions.  AR at 256.[2]  Moreover, at the hearing before the ALJ, Plaintiff's representative referred only to Plaintiff's "mental disorders" as the bases for finding her disabled, id. at 68, and Plaintiff answered in the affirmative when asked whether her inability to work was "all based on [her] psychiatric condition."  Id. at 74.  Although Plaintiff claimed, in June 2013, that she could not lift more than five pounds, id. at 277, she provided no medical or other evidence to the ALJ to support that claim, as she needed to do if she wished to have the ALJ consider it as a basis for finding her disabled.  Britt v. Colvin, 125 F. Supp. 3d 349, 353 (D. Mass. 2015).  Given that Plaintiff told the ALJ there was no physical basis for her claim of disability, and given that she did not provide to the ALJ any evidence supporting a rotator cuff impingement, the ALJ did not err by not listing the alleged impingement as a severe impairment

---

[2] The date of the report is stated in the AR's table of contents.  Doc. 12-1 at 2.

at step two.  See Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 23 (1st Cir. 2003)

("[H]ow could an administrator act unreasonably by ignoring information never presented to

it?") (citations omitted).

The Court also rejects Plaintiff's argument that the Appeals Council erred.  This Court

must give "'great deference'" to the Appeals Council's determination that there was no

reasonable probability that the additional evidence Plaintiff submitted "would change the

outcome of the [ALJ] decision."  Mills, 244 F.3d at 6; AR at 2.  This Court could only review

such a determination in the "extreme case[]" where it "rest[ed] on an explicit mistake of law or

other egregious error."  Mills, 244 F.3d at 5-6.  The Court finds the Appeals Council's

determination was not erroneous, let alone so erroneous that it was on par with an explicit

mistake of law, particularly given that Plaintiff's "new" evidence of rotator cuff impingement

was from June 2011, AR at 58, two-and-a-half years before Plaintiff's AOD of January 1, 2014.


B.     Whether the ALJ Assigned Improper Weight to Medical Opinions

1.     Legal Standard

An ALJ must "always consider the medical opinions in [the] case record."  20 C.F.R. §

404.1527(b).  Under the "treating source rule," the ALJ should generally give "more weight" to

the opinions of "treating sources, since these sources are likely to be the medical professionals

most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and

may bring a unique perspective to the medical evidence that cannot be obtained from the

objective medical findings alone or from reports of individual examinations."  20 C.F.R. §

404.1527(c)(2).  Controlling weight will be given to a treating physician's opinion on the nature

and severity of a claimant's impairments if the opinion "is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  Id.  Conversely, the ALJ may discount the weight given to a treating source opinion where it is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians.  Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004); 20 C.F.R. § 404.1527(c)(2)-(4); see also SSR 96-2p, 1996 WL 374188, at *2.

        2.      Discussion

        Plaintiff argues that the ALJ made four "errors in the weight he attributed to the opinions offered into evidence."  Doc. 21 at 13.  The Court will address each alleged error in turn.

                a.      First Alleged Error

        First, Plaintiff argues that the ALJ improperly assigned "great weight to the assessments of the state agency consultants," even though those assessments were "either in whole or in part based . . . on medical records that predated" Plaintiff's AOD of January 1, 2014.  Id. at 13-14 (citations omitted).  Plaintiff does not cite any specific facts to support this argument, nor does she dispute any assessment in particular.

        Plaintiff's argument is unavailing.  Plaintiff does not attempt to explain how the reliability of the agency consultants' assessments was diminished by the consultants' consideration of records that predated her AOD.  Moreover, Plaintiff ignores that the SSA is required to "consider *all* evidence in [the] case record," regardless of whether the evidence precedes or follows the AOD, in determining whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(3) (emphasis added).  Courts have in fact faulted ALJs for suggesting, as Plaintiff

does, that medical records preceding an AOD are *per se* irrelevant to a disability determination.

Indeed, in <u>Williams ex rel. Torres v. Barnhart</u>, 314 F. Supp. 2d 269 (S.D.N.Y. 2004), the SSA

and the claimant both *agreed* that an ALJ was wrong to say that "clinical records regarding

treatment before the . . . [AOD] are not relevant."  <u>Id.</u> at 272; <u>see also</u> <u>Hamlin v. Barnhart</u>, 365

F.3d 1208, 1223 n.15 (10th Cir. 2004) (stating that medical reports predating the AOD are part of

a claimant's case record and should be considered by the ALJ); <u>DeBoard v. Comm'r of Soc.</u>

<u>Sec.</u>, 211 F. App'x 411, 414 (6th Cir. 2006) (recognizing that evidence predating the AOD, when

evaluated in combination with later evidence, "may help establish disability"); <u>Perez v. Comm'r</u>

<u>of Soc. Sec.</u>, 2014 WL 444233, at *7 (M.D. Fla. 2014) (stating that evidence preceding the AOD

helps "to determine when [an] impairment began").  For these reasons, the Court rejects

Plaintiff's bare assertion that the consultants' assessments were not entitled to significant weight

simply because they were based "either in whole or in part" on records that predate Plaintiff's

AOD.


    b.  <u>Second Alleged Error</u>

   Second, Plaintiff argues that the ALJ erred by not "commen[ting] on the weight that he

gave, if any, to the opinions of the Plaintiff's treating psychiatrist, Manjola Ujkaj."  Doc. 21 at

14.  More specifically, Plaintiff asserts, the ALJ's decision contains no "analysis of Dr. Ujkaj's

psychiatric diagnoses and assignments of GAF scores, including scores of 50."[3]  <u>Id.</u>

---

[3] "The Global Assessment of Functioning ('GAF') scale rates overall psychological functioning on a scale of 0-100 that takes into account psychological, social, and occupational functioning."  <u>Sanchez v. Colvin</u>, 134 F. Supp. 3d 605, 609 n.1 (D. Mass. 2015) (citation omitted).  The GAF scale was used in the fourth edition of the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"), but the fifth edition ("DSM-V"), published in 2013, no longer uses such "scores as a diagnostic tool for assessing a patient's functioning because of the questionable probative value of such scores."  <u>Id.</u> (citing DSM-V 16).  "However, the Social Security Administration . . . has indicated that it will continue to receive into evidence and consider GAF scores."  <u>Lopez-Lopez v. Colvin</u>, 138 F. Supp. 3d 96, 111 (D. Mass. 2015) (citations and internal quotation marks omitted).  According to the DSM-IV, a GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals,

Contrary to Plaintiff's assertion, although the ALJ did not refer to Dr. Ujkaj by name – he instead referred to her as Plaintiff's "prescribing psychiatrist," AR at 47 – the ALJ thoroughly discussed her psychiatric diagnoses and assignments of GAF scores.  See AR at 43-44, 46-49 (discussing Exhibits 10F, 12F, and 15F, which contain Dr. Ujkaj's notes as well as the notes of Plaintiff's therapist, Maria Ferreras-Mendez, who treated Plaintiff in conjunction with Dr. Ujkaj).  The ALJ noted, among other things, that:  (1) in February 2014, Dr. Ujkaj diagnosed Plaintiff with major depressive disorder and noted the presence of various other possible disorders (e.g., generalized anxiety disorder, bipolar spectrum disorder, etc.); (2) in April 2014, after a period of improvement, Plaintiff complained to Dr. Ujkaj that her medications were not working properly, in response to which Dr. Ujkaj then increased Plaintiff's dosage of antidepressants; (3) in May 2014 and July 2014, Dr. Ujkaj found Plaintiff to be improving, even assigning Plaintiff a GAF score of 65 in July; (4) in August 2014 and September 2014, the last dates for which there are records by Dr. Ujkaj in the Administrative Record, Plaintiff's condition fluctuated somewhat, and Dr. Ujkaj assigned Plaintiff a GAF score of 55 in September.  Id. at 46-48; see also id. at 591, 612.

Moreover, although the ALJ did not explicitly state that he gave Dr. Ujkaj's opinions significant weight, that fact is obvious from his written decision.  In the decision, the ALJ repeatedly cited Dr. Ujkaj's findings that Plaintiff's symptoms were moderate or even mild to support his own conclusion that Plaintiff's ability to work was only moderately impaired.  See id.

---

frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Colon v. Astrue, 841 F. Supp. 2d 495, 498 n.3 (D. Mass. 2012) (citations and internal quotation marks omitted).  A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Id. (citations and internal quotation marks omitted).  A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (citation and internal quotation marks omitted).

at 46-49.  Because the ALJ's "factual findings as a whole" showed that he accepted Dr. Ujkaj's

opinions, the ALJ was not required to make an "explicit credibility finding[]," as Plaintiff

suggests.  Beverly Enters.-Mass, 174 F.3d at 26.

That said, Plaintiff is correct that the ALJ overlooked Dr. Ujkaj's assignment of GAF

"scores of 50."  Doc. 21 at 14.  The ALJ incorrectly stated that "since resuming treatment in June

2013, the claimant's GAF scores have ranged from 55-65," citing reports by Dr. Ujkaj.  AR at

48.  In fact, Dr. Ujkaj assigned Plaintiff a GAF score of 50 at their first two appointments, on

February 14, 2014, and on March 3, 2014.  Id. at 535, 541.  It was only in their remaining seven

appointments, which spanned from March 17, 2014, to September 3, 2014, that Dr. Ujkaj

assigned Plaintiff GAF scores of 55 to 65.  Id. at 548, 564, 574, 583, 591, 598, 612.

"[T]he ALJ's mischaracterization of the GAF score history" was not harmful, however,

and remand would "amount to no more than an empty exercise."  McNelley v. Colvin, 2016 WL

2941714, at *1 (1st Cir. 2016) (finding such a mischaracterization harmless where the ALJ had

other "sufficiently compelling reason[s]" supporting his decision to discount the weight of a

doctor's opinions) (citation omitted); Ward, 211 F.3d at 656 (citations omitted); see also

Sokolovskaya v. Colvin, __ F. Supp. 3d __, 2016 WL 1735814, at *10 (D. Mass. 2016).  The

ALJ cited Plaintiff's GAF score history in support of an otherwise amply supported conclusion,

i.e., that Plaintiff suffered from "only moderate symptoms or moderate limitations in

functioning."  AR at 48.  That conclusion was based on "the medical evidence and the record as

a whole," which showed, inter alia, that (1) "[d]espite her imapirments, the claimant prepares

meals, performs household chores, manages her finances, cares for a pet, and socializes with

family," id.; (2) on March 26, 2014, Plaintiff's therapist, Maria Ferreras-Mendez, stated that

Plaintiff had "moderate" Major Depressive Disorder and would be able to perform simple tasks

without limitation and "moderately complex tasks" with occasional problems "because of her depression and anxiety," id. at 49, 509; (3) from March 17, 2014, to September 3, 2014, Dr. Ujkaj assigned GAF scores indicating Plaintiff had only mild or moderate symptoms, see supra; and (4) various "state agency consultants' assessments . . . found moderate limitations with the ability to perform simple tasks with limited social interaction," id. at 49.  These reasons were sufficiently compelling to find that Plaintiff's ability to work was only moderately impaired. Thus, the ALJ's failure to note the first two of Dr. Ujkaj's nine GAF score assignments was harmless error.

c.     Third Alleged Error

Third, Plaintiff argues that the ALJ erred in failing to "explain why he did not give" an October 22, 2014, letter by Maria Ferraras-Mendez the same "great weight" that he gave to her March 16, 2014, statement, in which she said Plaintiff would be able to perform simple tasks without limitation and "moderately complex tasks" with occasional problems "because of her depression and anxiety."  Doc. 21 at 14; see also Doc. 29 at 5 ("Since the [ALJ] did not include the October 22, 2014 Ferreras Letter in the record, he has not evaluated the totality of the evidence.").  In the letter, Ms. Ferreras-Mendez stated that Plaintiff's "diagnoses (including her Global Assessment of Functioning, GAF, which is currently recorded as 50) was reviewed most recently at her medication evaluation . . . on February 14, 2014."  AR at 30.  Ms. Ferreras-Mendez further stated that she "would rate Ms. Jordan currently at or around 50 as a GAF score."  Id.  Thus, the letter would appear to show that Plaintiff's condition worsened from "moderate" on March 16, 2014, when Ms. Ferreras-Mendez made the statement that the ALJ

gave great weight, to "serious" on October 22, 2014, when Ms. Ferreras-Mendez supposedly wrote the letter that the ALJ allegedly ignored.

The ALJ did not err. The Court has no basis to believe Plaintiff's assertion that Ms. Ferraras-Mendez's letter was written on October 22, 2014. The letter is undated and the copy of it in the Administrative Record merely shows that it was *faxed* on October 22, 2014. Id. In addition, Ms. Ferreras-Mendez's statement in the letter that Plaintiff's "most recent[]" GAF was on February 14, 2014, belies the claim that the letter was written on October 22, 2014: in fact, Plaintiff had at least thirteen GAFs between February 14, 2014, and October 22, 2014, five of which Ms. Ferreras-Mendez performed herself. E.g., id. at 537, 541, 548, 564, 574, 583, 591, 593, 598, 608, 610, 612, 619. Plaintiff's last GAF before October 22, 2014, was actually on September 22, 2014, when Ms. Ferreras-Mendez assigned Plaintiff a GAF score of 55. Id. at 619. Thus, contrary to Plaintiff's assertion, there is strong reason to believe that Ms. Ferreras-Mendez's letter was written well before October 22, 2014 – even likely before February 26, 2014, the date Ms. Ferreras-Mendez performed another GAF of Plaintiff. Id. at 537. The letter therefore does not add anything new to the AR, which already showed that Plaintiff received a GAF score of 50 on February 14, 2014. Id. at 535. The absence of any discussion of the letter in the ALJ's decision was thus not erroneous.

In the alternative, even if the Court were to ignore all evidence to the contrary and assume that the letter was written on October 22, 2014, the absence of discussion of it in the ALJ's decision was not erroneous because the letter was untimely. The hearing before the ALJ took place on September 10, 2014, and the ALJ told Plaintiff, who was represented, id. at 63, at least twice that the record would remain open for two weeks, absent a reasonable request for extension, so that Plaintiff could submit additional medical records and arguments. Id. at 111-

13.  There is no indication that Plaintiff requested an extension of time, so the AR closed on

September 24, 2014, 28 days before Plaintiff submitted the undated letter by Ms. Ferreras-

Mendez.  The Court cannot fault the ALJ for not discussing an untimely submission.  See 42

U.S.C. § 405(g) (authorizing courts to remand for an ALJ to consider new evidence only if

"good cause" is shown for the failure to present it in a timely fashion); Boakai v. Gonzalez, 447

F.3d 1, 4 (1st Cir. 2006) (citing, with approval, another court's statement that "untimely filings

with administrative agencies do not constitute exhaustion of administrative remedies");

Ketchikan Drywall Servs., Inc. v. Immigration and Customs Enforcement, 725 F.3d 1103, 1115

n.12 (9th Cir. 2013) ("The ALJ properly refused to consider these untimely-produced

documents; there was no error."); Appalachian Power Co. v. E.P.A., 249 F.3d 1032, 1059 (D.C.

Cir. 2001) ("An agency is not required to consider issues and evidence . . . that are not timely

filed.").


### d.    Fourth Alleged Error

Fourth, Plaintiff argues that the ALJ erred in giving "less weight" to the psychological

evaluation report by Susan Mascoop, Ed.D, which was signed on July 16, 2014, and based on

two meetings with Plaintiff in June 2014.  Doc. 21 at 14; AR at 554, 59.  Dr. Mascoop stated in

the report that Plaintiff suffered from "[m]arked restrictions in activities of daily living" and

"[m]arked impairment in social functioning," making it "unlikely that [Plaintiff] will be

successful in the job market, both in finding work and remaining employed."  AR at 559.

Plaintiff argues that the ALJ's weighting was erroneous because (1) it was based on the ALJ's

mistaken belief that Dr. Mascoop only saw Plaintiff "for one session of an evaluation," when in

14

fact Dr. Mascoop saw Plaintiff twice; and (2) Dr. Mascoop was "the only evaluator to administer

psychological testing in addition to her two interviews."  Doc. 21 at 14-15 (citations omitted).

The ALJ erred in stating that Dr. Mascoop "only saw [Plaintiff] for one session of an

evaluation."  AR at 49.  However, the error was harmless, as Plaintiff's first session with Dr.

Mascoop was brief and did not produce reliable information.  By Dr. Mascoop's account, the

first session with Plaintiff was "relatively brief due to [Plaintiff's] difficulty with English."  Id. at

554.  According to Dr. Mascoop, although Plaintiff had previously "indicated that her English

was adequate and that she did not require an interpreter, . . . it was clear early in the [first]

meeting that she did not fully comprehend the interview questions," and she "was reluctant to

talk about her . . . personal history[] or current situation."  Id. at 554-55.  After Plaintiff spoke

with her student attorney, though, she agreed to a second appointment and to using an interpreter.

Id. at 554.  While the first meeting was brief, the second one lasted three hours and Plaintiff

"provided more information" about her personal history and current situation.  Id.  The Court

does not find that the ALJ committed harmful error in stating that Dr. Mascoop only saw

Plaintiff for one session, given (1) the brevity of the first session in comparison to the second; (2)

Plaintiff's "clear" inability to "fully comprehend the interview questions" at the first session; and

(3) Plaintiff's reluctance to talk about her "personal history[] or current situation" at the first

session.

As for the fact that Dr. Mascoop was "the only evaluator to administer psychological

testing,"[4] Plaintiff does not cite any authority, and the Court is not aware of any, stating that the

administration of psychological testing requires an ALJ to accord an examining source's opinion

---

[4] Dr. Mascoop evaluated Plaintiff using, *inter alia*, the Beck Depression Inventory and the Beck Anxiety Inventory.
AR at 554.

significant weight.  On the contrary, the SSA's regulations state that a treating source's opinion will generally receive "more weight" because the source is "most able to provide a detailed, longitudinal picture of" a claimant's medical impairments, and because the source "may bring a unique perspective to the medical evidence *that cannot be obtained . . . from reports of individual examinations*."  20 C.F.R. § 404.1527(c)(2) (emphasis added).  Here, Plaintiff's treating sources' observations and opinions provide such a longitudinal picture and unique perspective.  As the ALJ noted, Dr. Ujkaj's and Ms. Ferreras-Mendez's notes showed Plaintiff improved after Dr. Mascoop's evaluation, albeit with some setbacks due to "family and social stressors."  AR at 49; see also, e.g., id. at 591, 593, 598, 608, 610, 612, 619 (showing Plaintiff suffered only mild to moderate symptoms after Dr. Mascoop's evaluation).[5]  Thus, the Court rejects Plaintiff's suggestion that Dr. Mascoop's opinion was entitled to more weight simply by virtue of the fact that she administered psychological testing.

C.      Whether the ALJ's Hypothetical Questions Were Deficient

Finally, Plaintiff argues that the ALJ erred in posing hypothetical questions to the vocational expert ("VE") – about what jobs, if any, Plaintiff could perform with various alleged limitations – without including "any exertional limitation."  Doc. 21 at 15.  Plaintiff notes that in a June 18, 2013, report, she stated she could not lift more than 5 pounds.  Id. at 8 (citing AR at 277).

---

[5] Though not a factor in this opinion, the Court notes a curious discrepancy between what Plaintiff told Dr. Mascoop and what she told Dr. Ujkaj two days later.  At her meeting with Dr. Mascoop on June 30, 2014, which was specifically "to determine whether she has a psychological . . . impairment according to SSA regulations," Plaintiff stated that she "worries" and is anxious "constantly," and that during the previous month felt so depressed that she felt "caged."  AR at 557-59.  However, on July 2, 2014, Plaintiff told Dr. Ujkaj, "I've been doing much better," and reported that, since she started taking a medication dosage prescribed on May 14, 2014, id. at 574, "her anxiety has been almost none and she is back to feeling very well overall."  Id. at 589.

The Court rejects Plaintiff's argument.  First, it is waived, as Plaintiff's representative "failed to object during the administrative hearing" when the ALJ told the VE to assume, in answering questions, that Plaintiff "has the capacity to perform at all exertional levels."  Bonner v. Colvin, 153 F. Supp. 3d 465, 477 (D. Mass. 2015) (citations omitted); AR at 104.  Second, even assuming the argument is not waived, it is meritless.  An ALJ "is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible."  Doshi v. Colvin, 95 F. Supp. 3d 138, 149 (D. Mass. 2015) (citation and internal quotation marks omitted); see also Arocho v. Sec'y Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).  As the Court previously explained, Plaintiff only stated that she had mental limitations, not exertional limitations, on her ability to work, and there was no medical or other evidence before the ALJ supporting the existence of any exertional limitation, whether a rotator cuff impingement or anything else.  See supra Section III.A.  Thus, the ALJ had no obligation – indeed, no reason at all – to include exertional limitations in his hypothetical questions to the VE.[6]

---

[6] Plaintiff also claims that the Appeals Council erred, but does not state exactly how.  Doc. 21 at 15.  Presumably, Plaintiff is challenging the Appeals Council's decision not to review the ALJ's decision in light of the "new" evidence that Plaintiff submitted of a 2011 rotator cuff injury.  For the reasons stated in this section and in Section III.A, supra, the Court rejects this argument, finding the Appeals Council did not commit any error, let alone an egregious error that would permit this Court to review the Appeals Council's denial of review.  See Mills, 244 F.3d at 5-6.

IV.     <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES Plaintiff's Motion to Reverse (Doc. 20)

and ALLOWS Defendant's Motion to Affirm (Doc. 25).


SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge